**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-426 (CKK)** |
| **v.** | : | |
| | : | |
| **NICHOLAS P. HENDRIX,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Nicholas P. Hendrix to a term of 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

I.      **Introduction**

Defendant Nicholas P. Hendrix, a 35-year-old veteran of the United States Army, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on June 27 2022, (ECF No. 35 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the government's current estimate of the losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Hendrix pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 14 days' incarceration coupled with probation is appropriate in this case. Hendrix entered the Capitol through the Rotunda Doors despite police officers' evident efforts to deny such access.  Closed and blocked doors with shattered glass, blaring alarms, chanted demands from other rioters to "Let us in" and blaring alarms all provided notice to Hendrix and others that entry was prohibited.    Although Hendrix's presence in the Capitol was brief, amounting to approximately 90 seconds, by his own admission, he considered re-entering the Capitol. Exposure to chemical spray deterred him.  Through his guilty plea Hendrix has accepted responsibility for his conduct, but he has not directly expressed any remorse for his actions.[2]

The Court must also consider that Hendrix's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00133 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic process of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of his fellow rioters enabled the breach of the Capitol and threats against the lives of police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they

---

[2] According to the PreSentence Investigation Report (PSR), Hendrix's wife advised the Probation Officer preparing the report that he feels "horrible" about his involvement in the events of January 6, 2021.  PSR ¶ 32. Hendrix himself has not said as much, however.

had the safety of numbers.") (statement of Judge Chutkan).  Accordingly, a sentence of more than probation is appropriate in this case. Here, the facts of and circumstances of Hendrix's crime support a sentence of a 30-day term of home detention along with three years of probation in this case.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 35 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Hendrix's conduct and behavior on January 6.

### Defendant Hendrix's Role in the January 6, 2021 Attack on the Capitol

Hendrix tried and failed to persuade his friends to join him on a trip from his home in Maine to the January 6, 2021 Save America rally in Washington, D.C.  On January 5, 2021, Hendrix drove alone from Maine to Newton, Massachusetts where he parked his car and boarded a bus for the District of Columbia.  He arrived at approximately 6:30 a.m. on January 6, 2021, wearing, as depicted below, a camouflage-colored sweatshirt and carrying a flag and a sign that stated, "Stop the Communist & Terrorist Revolution."



*Figure 1: Facebook Post Recovered from Hendrix's Phone*

By the time of his arrival at the rally Hendrix also layered a shirt disparaging the President-elect

and the Vice-President-elect with an obscene remark.



*Figure 2: Screenshot from Video from Hendrix's Phone*



*Figure 3: Hendrix at the Capitol*



*Figure 4: FBI Photograph of Hendrix Displaying The T-Shirt He Wore
to the Capitol on January 6, 2021*

Hendrix attended the rally until approximately 1:14 p.m., and then walked to the Capitol.

At approximately 2:12 p.m., he made a video recording using his mobile telephone as he walked

past barriers along the boundary of the Capitol's west lawn.  By approximately 3:00 p.m., Hendrix

arrived at the Capitol's East Plaza.  As the background of Figure 3 above shows in part, a crowd

was located on the East Plaza and surrounding lawn, and at the foot of the Capitol steps leading to

the East Door.  After posing for photographs like the one shown in Figure 3, Hendrix walked to

the steps below the East Door where the crowd was most dense, as shown below in Figure 5:



*Figure 5: Photograph from Hendrix's Phone Showing His Approach towards the East Door*

Hendrix chose not to remain with the crowd at the East Plaza or at the foot of the Capitol

steps. Instead, he ascended through the packed crowd where, at approximately 3:08 p.m., he

reached the area just outside of the East Door.  There, he made several recordings as the crowd

massed outside the door chanted "Let us in!"

Within approximately one minute of Hendrix's arrival at the top of the steps, police inside

of the building were able to close the East Doors at 3:09:15-20 p.m. to keep the crowd outside

from entering the Capitol.



*Figure 6: Screenshot From Interior Surveillance Camera Footage Showing*
*East Interior Doors Closed at Approximately 3:09:20 p.m.*

Seconds later, at 3:09:59, Hendrix recorded the crowd outside of the East Doors in a video that begins with chants of "Let us in!"  A screenshot from that video showing his proximity to the entrance appears below in Figure 7.



*Figure 7: Screenshot from Hendrix's Cellphone Recording by East Door*
*That Begins With Chants of "Let Us In"*

At 3:11:02, Hendrix created another video that began with a shout of "Let us in!" Approximately five seconds into the video, the crowd cheers as one of the interior East Doors opens and members of the crowd inside appear to be ejected from the building. Alarms are audible as the rioters rush out of the door. At approximately the same time, interior surveillance camera footage shows a rioter opening one of the interior East Doors and leaving the building followed by members of the crowd that police then push out.



*Figure 8: Screenshot from Interior Surveillance Camera Footage of Rioters Exiting at 3:11:25*

At 3:11:46, Hendrix created another video lasting approximately 4 minutes that shows the crowd from inside continuing to exit as alarms blare; displays broken glass in the interior doors; and records another shout of "Let us in," and a rioter crying "Now they'll have to start shootin' us." The recording continues as it captures the exiting rioters as they celebrated with chants of "USA" and as a line of police officers (and later, a member of the press) passed through the crowd and, with difficulty, entered the Capitol.  Hendrix's video also recorded a shout from the crowd, taunting, "Are we holding up Congress?  Are they a little upset?" and the shouted reply, "Fuck them."  After the officers entered, the recording shows that Hendrix approached the doorway and entered the Capitol.  As he did, different people in the crowd shout "Push" and an officer is visible briefly who appears to be pushing against the crowd from inside the Capitol.  Once he entered the Capitol, Hendrix also recorded a glimpse of his own face.



*Figure 9: A screenshot of Hendrix's Face
From a Recording in His Cellphone of His
Entry Into the Capitol*

A surveillance camera also recorded Hendrix as he entered the Capitol with his flag and poster.  The footage shows Hendrix in the doorway with his cellphone raised and captures his voluntary approach to the entrance.  This footage also shows Hendrix near the entrance as the crowd begins to push, creating momentum that carried Hendrix into the building.  After Hendrix was clearly past the entrance, he appears to stumble briefly, but remains smiling for the duration of his time inside the Capitol.  He never lost hold of his flag or his phone, and kept the poster that

he wore around his neck.  Once inside, Hendrix could not have overlooked police efforts to stop others from entering.



*Figure 10: Hendrix in the East Door Entrance Indicated by a Red Arrow*



*Figure 11: Surveillance Footage of Police Blocking Entry While Hendrix, Shown Beneath a Red Arrow, Makes a Recording Inside the Rotunda Lobby*

The intrusion of Hendrix and others at 3:15 p.m. created a potentially dangerous situation for anyone inside the East Doors.  A straight line from that doorway leads into a set of doors to the Rotunda.  By 3:10 p.m., reinforcements from the Metropolitan Police Department had joined U.S. Capitol Police inside the Rotunda in an effort to sweep an earlier crowd of intruders from the Rotunda and out of the building.  By 3:12 p.m., members of the crowd from the Rotunda began to flow out of that area towards the East Doors, and continued to do so.  The crowd inside formed by this outflow was already dense as Hendrix and others entered, as shown in the foreground of Figure 10, above.  Hendrix's own recording provides an image of the crowd that continued to flow towards the East Doors from the Rotunda after he entered:



*Figure 12: Screenshot from Hendrix's Video Showing Rotunda Doorway*

Surveillance footage and Hendrix's own recording show that the area directly inside the Rotunda Doors was not capable of safely accommodating the large crowd of rioters in that area plus the substantial crowd attempting to force its way inside.

Hendrix's interior video documents certain risks from entering the Capitol.  It includes a rioter stating that someone was shot, and "that's why they want us out." Before the video ends as Hendrix was attempting to leave the building, it also reflects the difficulty members of the crowd had when attempting to exit.

Even so, Hendrix did not leave the Capitol grounds or even leave the area just outside of the East Doors.  Instead, he returned to the threshold of the East Doors and stood facing the police line as he recorded exiting rioters, the sound of alarms, the police line, and chants of "Fight for Trump" and "Hang Mike Pence."  He was close enough to capture the image below of police using shields to barricade the entrance:



*Figure 12: Screenshot from a Video Recovered from Hendrix's Phone*
*After His Exit From the Capitol*

Despite the conditions he had just witnessed, Hendrix remained in the doorway blocking the exit even as other rioters, with increasing agitation, shouted at members of the crowd like Hendrix to "back up" and to "make a hole" for them to pass through.  Hendrix remained where he

was, seeking to re-enter the Capitol. He recorded a physical confrontation with a police officer who tried to close the East Doors. Hendrix remained close enough to the police line to record the image below as officers attempted to disperse the crowd with chemical irritant spray at approximately 3:42 p.m.



*Figure 13: Screenshot from Recording Recovered from Hendrix's Phone*

Hendrix left the doorway only after his exposure to the chemical spray. He later returned to the boarding area for his bus and left Washington at about 6:30 p.m., arriving at his home in Maine on January 7, 2022.

Two weeks later, on January 21, 2021, the FBI contacted Hendrix and he agreed to meet with agents at a local parking lot. During that meeting, Hendrix admitted that he entered the Capitol, stating that the crowd "pushed themselves" inside. He explained that he left the building after one or two minutes and attempted to re-enter but left after he was hit with pepper spray. According to Hendrix, he believed that United States Capitol Police were not offering much

resistance to entry and he thought the police were "quitting" and allowing the crowd to go inside. *See* ECF 1-1 at 2.  He admitted he knew it was illegal for him to enter the Capitol and he allowed agents to obtain certain photographs and videos and videos taken on January 6 from his phone.  *Id.*

On March 25, 2021, Hendrix spoke again with FBI agents.  He provided additional details about his travel from Maine to Washington, D.C. on January 6.  He identified himself and signed and dated screenshots of his face, such as the one shown above in Figure 9.  Hendrix also produced the shirt, sunglasses, and poster that he wore on January 6 and allowed agents to photograph them. *See, e.g.*, Figure 4, above.  Except for Facebook posts showing his arrival at the Massachusetts bus station and his arrival in Washington, D.C., Hendrix denied using social media to share content about the attack on the Capitol on January 6.

*The Charges and Plea Agreement*

On May 25, 2021, the United States charged Hendrix by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF 1.  On May 27, 2021, law enforcement officers arrested him in Portland, Maine.  ECF 5; PreSentence Investigation Report (PSR) ¶ 5. On June 23, 2021, the United States charged Hendrix by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF 9; PSR ¶ 1. On June 27, 2022, pursuant to a plea agreement, Hendrix pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Hendrix agreed to pay $500 in restitution to the Department of the Treasury. Before his guilty plea, Hendrix sought leave to pre-pay his anticipated restitution obligation, ECF 32; this Court granted leave to make early restitution payments after acceptance of his guilty plea. ECF 33.

III.    **Statutory Penalties**

Hendrix now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Hendrix faces up to six months of imprisonment and a fine of up to $5,000.  ECF 36 at 1;  PSR ¶¶ 60, 62, 65, 70. Hendrix must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration for 14 days, a term of probation for 36 months, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did

so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Hendrix's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Hendrix personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Hendrix is therefore not a mitigating factor in misdemeanor cases.

By his own admission, Hendrix knew it was illegal to enter the Capitol.  He did so anyway. Moreover, he cannot convincingly claim that police officers were willing to look the other way and passively allow a mob to join others inside of the Capitol participating in an ongoing and unlawful breach.  The size and density of the crowd packed outside of the East Doors provided one indication to Hendrix that the crowd he had joined was not being welcomed into the building. The shouted demands that Hendrix recorded to "Let us in!" provided clearer notice that members

19

of the mob in fact were denied entry.  Hendrix was outside and within reach of the East Doors at 3:09 when police succeeded in closing those doors, providing yet another message that the mob was unwelcome.

When a rioter was able to open a door and slip out, Hendrix witnessed and recorded rioters propelled from inside the Capitol.  Broken glass in the door is visible as rioters are ejected. Although muffled by the shouts of the crowd, the sound of alarms is still audible in this recording. Despite each and every indication that his entry was prohibited, Hendrix moved from his position at the side of the doors to face the entrance and move against the tide of rioters who continued to flow out through the East Doors. Hendrix made his way inside over shouts from others to be let in, commands to push, and even one cry that police would have to start shooting at the crowd. Although the crowd's momentum may have briefly carried Hendrix into the Capitol, he nevertheless had to work to gain entry and disregard every effort from police to prevent his intrusion.

Although Hendrix himself was not violent, his entry with others at the very least caused unsafe overcrowding inside the confines of the Rotunda lobby.  Hendrix experienced these conditions.  By the time of his intrusion into the Capitol, even if he had been previously unaware, he knew then that members of the mob sought to interfere with the Joint Session of Congress, chanted to "hang" the Vice President, and anticipated gunfire from the police.  He was inside the Capitol for less than two minutes but was present during police efforts from inside the Capitol to expel the crowd.  Despite these circumstances, Hendrix changed course after leaving the building and sought to re-enter the Capitol, facing off against police in the doorway until directly hit with chemical spray.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 14 days' incarceration and 36 months' probation in this matter to address the serious nature of the offense and Hendrix's conduct.

### B.  The History and Characteristics of Hendrix

Hendrix is a 35-year-old licensed pipefitter.  PSR ¶ 47.  He served in the United States Army from 2006-2009 and is a veteran of the conflict in Iraq who qualifies for military disability benefits.  PSR ¶¶ 38, 49.  He has a history of addiction and recovery. PSR ¶¶ 41a - 45. As an adult, he has a single criminal conviction for a controlled substance violation resulting in a $434 fine; however, neither the circumstances of the offense nor information confirming representation by counsel are available.  PSR ¶ 22.

This Court should also weigh Hendrix's cooperation with law enforcement officials.  He agreed to two interviews with the FBI, acknowledged his awareness that his conduct on January 6 was unlawful, and provided the contents of his phone and other evidence to investigating agents.  Although he was cooperative, Hendrix's attempt to minimize his conduct by suggesting the police allowed entry into the Capitol contradicts the evidence of his offense, including his own recordings.  This effort to avoid full accountability for his actions points to a higher need for individual deterrence.

Hendrix's compliance with conditions of pretrial release has been imperfect.  He failed to report an encounter with law enforcement officials for driving at night with a broken taillight.  He failed twice to report for an assessment required by his release conditions, but did eventually complete the assessment.  PSR ¶ 6.  His characteristics reflect at a minimum that Hendrix may benefit from the term of probation as recommended here, while the nature of the offense and the factors discussed below support a such a term with a period of incarceration.

Additionally, while Hendrix's former military service is commendable, it renders his conduct on January 6 all the more troubling.  As a former service member, Hendrix's decision to breach a guarded government building is disturbing given: 1) the dangerously crowded conditions when Hendrix entered the Capitol; 2) the volatile nature of the crowd that anticipated gunfire from the police; and 3) the calls to hang the Vice President, an officer under the Constitution that Hendrix had sworn an oath to support and defend.[3] Hendrix's acknowledgement of responsibility for his offense through his plea, his decision to complete restitution payments in advance of that plea, his lack of any serious criminal history, his cooperation with law enforcement, and his disabilities may arguably weigh in favor of leniency; however, his conduct and its contradiction with his former military service call for specific deterrence and require more than a sentence of probation.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of

---

[3] *See* 10 U.S.C. § 502(a) (Enlistment Oath).
[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Hendrix made an effort to do what he knew was illegal. He worked through a crowd to reach the East Doors, and joined those pushing against police, although he did not push or encourage others to do so. He walked past doors with broken glass and disregarded alarms. He entered the Capitol amidst cries for violence. He experienced the overcrowding inside of the Capitol as police tried to eject the crowd and prevent others from entering the building. And minutes after exiting from the Capitol he decided to re-enter, and stood facing a line of police officers for at least ten minutes as officers again blocked entry. He retreated only after police used pepper spray. As noted above, these facts demonstrate the need for individual deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Hendrix based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. Although those like Hendrix convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[6] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Hendrix has pleaded guilty to Count Four of the Superseding Information, charging him with parading, picketing, and demonstrating in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a),

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as

conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In one example, *United States v. Buhler*, 21-cr-510 (CKK), the government recommended a split sentence of 30 days' home detention and 36 months' probation for a defendant who also pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). Buhler was inside the Capitol for approximately six minutes. During her approach to the Capitol, she ignored sounds from the detonation of flash bangs; the sight of rioters climbing scaffolding and tearing the tarp that covered the northwest scaffolding; and broken glass outside of the Senate Wing doors where she entered the Capitol. Buhler cheered as rioters crushed officers at the East Rotunda doors. Unlike Hendrix, she entered the Senate Gallery, a sensitive area of the Capitol Building, and she later deleted photographs documenting her presence inside of the Capitol. Buhler received a split sentence of 30 days' incarceration with 36 months' probation and a $5,000 fine. Although Buhler's conduct was more serious, the brevity of her presence inside the Capitol makes her comparable to Hendrix, who entered the Capitol for 90 seconds. Unlike Buhler, Hendrix attempted to go back into the Capitol and may well have done so if officers had not resorted to chemical spray.

In *United States v. Sarko*, 21-cr-591 (CKK), the government recommended a sentence of 30 days' incarceration, three years' probation, 60 hours of community service, and a $500 fine for a defendant who pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). Sarko spent 20 minutes inside the Capitol after observing the violent entry of other rioters. He entered the office of Senator Merkley, a sensitive area of the building. He posted video from his breach of the Capitol

on social media and celebrated violence that occurred during the riot.  Sarko received a sentence of 30 days' of incarceration with a term of 36 months' probation.  While Sarko's conduct was more culpable than that of Hendrix, the recommendation for Hendrix's sentence is lower.

In *United States v. Hyland,* 21-cr-50 (CRC), the government recommended 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Hyland also entered a guilty plea for violating 40 U.S.C. § 5104(e)(2)(G), entered the Capitol through the East Doors, and remained inside for 90 seconds before exiting.  Unlike Hendrix, after attending the same rally, Hyland returned to his hotel room where the television broadcast footage and reports of the breach of the Capitol; Hyland also received a text message describing the violent breach of the Capitol by a crowd that overran barricades and overwhelmed police.  Hyland went to the Capitol after receiving these reports.  At sentencing, he expressed remorse, and the court imposed a sentence of seven days in jail and $500 in restitution.

In *United States v Jennifer Leigh Ryan*, 21-cr-50 (CRC), the government recommended a sentence of 60 days' incarceration. Ryan also pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G), entered the Capitol with codefendant Hyland through the East Doors after viewing the same reports of a violent breach occurring there, and remained in the lobby for 90 seconds. Ryan livestreamed her entry into the Capitol and described the events of January 6 as a prelude to war.  She publicly expressed a lack of remorse for her actions to thousands of her followers on social media, misrepresented her conduct, celebrated the destruction of property, and voiced a sense of impunity for her actions based on her appearance, race, and employment.  She received a sentence of 60 days' incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.   This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation.

As eight judges of this District have now concluded, this Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; *see, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21-cr-591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21-cr-342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split

sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21-cr-601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21-cr-342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same).[7] This Court should follow suit and sentence Hendrix to 14 days' custody and 36 months' probation.

But this Court need not decide that question in this case because there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10).   Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98.   First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.   *Id.*   Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."   *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.   *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of  confinement, *e.g.*, for a week

---

[7] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§  5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21-cr-620 (BAH) ECF D.D.C. Apr. 29, 2022) ECF 43 (same); *United States v. Heinl*, 21-cr-370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43  (same); *United States v. Cameron*, 22-cr-00017 (TFH) ECF 36 (D.D.C. Aug. 17, 2022) (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.  For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

**VI.     Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Hendrix to 14 days of incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/Karen Rochlin
Karen Rochlin
Assistant United States Attorney Detailee
DC Bar No. 394447
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov

## **CERTIFICATE OF SERVICE**

On this 14th day of October, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ *Karen Rochlin*
Assistant United States Attorney