### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-426 (CKK)** |
| | : | |
| **NICHOLAS HENDRIX,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S RESENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this resentencing memorandum. This Court originally sentenced Nicholas Hendrix to a mix of imprisonment and probation as appropriate under the 18 U.S.C. § 3553(a) sentencing factors. Because that sentence has been determined to be invalid, the D.C. Circuit vacated the sentence and remanded to this Court for resentencing so that the Court can impose a new lawful sentence.

On January 6, 2021, while members of Congress gathered in the United States Capitol to certify the results of the 2020 presidential election, Hendrix joined a large mob of rioters and entered the Capitol through the Rotunda Doors despite police officers' evident efforts to deny such access. Closed and blocked doors with shattered glass, blaring alarms, and chanted demands from other rioters to "Let us in" all provided notice to Hendrix and others that entry was prohibited. *See* Government's Sentencing Memorandum, ECF 41. Although Hendrix's presence in the Capitol was brief, amounting to approximately 90 seconds, by his own admission, he considered re-entering the Capitol. Exposure to chemical spray deterred him.

For this conduct, Hendrix pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. The Court sentenced Hendrix to a "split sentence" – a term of imprisonment and a term of probation -- under Title 18 U.S.C. §

3561(a)(3): Hendrix was sentenced to 30 days of incarceration followed by a term of three years of probation, $500 in restitution, and a $10 special assessment. ECF 46. He completed his 30-day prison term on February 24, 2023.

## I.      **Factual Background**

Hendrix tried and failed to persuade his friends to join him on a trip from his home in Maine to the January 6, 2021 Save America rally in Washington, D.C. On January 5, 2021, Hendrix drove alone from Maine to Newton, Massachusetts where he parked his car and boarded a bus for the District of Columbia. He arrived at approximately 6:30 a.m. on January 6, 2021, wearing, as depicted below, a camouflage-colored sweatshirt and carrying a flag and a sign that stated, "Stop the Communist & Terrorist Revolution."



*Figure 1: Facebook Post Recovered from Hendrix's Phone*

By the time of his arrival at the rally Hendrix also layered a shirt disparaging the President-elect

and the Vice-President-elect with an obscene remark.



*Figure 2: Screenshot from Video from Hendrix's Phone*



*Figure 3: Hendrix at the Capitol*



*Figure 4: FBI Photograph of Hendrix Displaying The T-Shirt He Wore to the Capitol on January 6, 2021*

Hendrix attended the rally until approximately 1:14 p.m., and then walked to the Capitol. At approximately 2:12 p.m., he made a video recording using his mobile telephone as he walked past barriers along the boundary of the Capitol's west lawn.  By approximately 3:00 p.m., Hendrix arrived at the Capitol's East Plaza.  As the background of Figure 3 above shows in part, a crowd was located on the East Plaza and surrounding lawn, and at the foot of the Capitol steps leading to

the East Door.  After posing for photographs like the one shown in Figure 3, Hendrix walked to

the steps below the East Door where the crowd was most dense, as shown below in Figure 5:



*Figure 5: Photograph from Hendrix's Phone Showing His Approach towards the East Door*

Hendrix chose not to remain with the crowd at the East Plaza or at the foot of the Capitol

steps. Instead, he ascended through the packed crowd where, at approximately 3:08 p.m., he

reached the area just outside of the East Door.  There, he made several recordings as the crowd

massed outside the door chanted "Let us in!"

Within approximately one minute of Hendrix's arrival at the top of the steps, police inside

of the building were able to close the East Doors at 3:09:15-20 p.m. to keep the crowd outside

from entering the Capitol.



*Figure 6: Screenshot From Interior Surveillance Camera Footage Showing*
*East Interior Doors Closed at Approximately 3:09:20 p.m.*

Seconds later, at 3:09:59, Hendrix recorded the crowd outside of the East Doors in a video that begins with chants of "Let us in!"  A screenshot from that video showing his proximity to the entrance appears below in Figure 7.



*Figure 7: Screenshot from Hendrix's Cellphone Recording by East Door
That Begins With Chants of "Let Us In"*

At 3:11:02, Hendrix created another video that began with a shout of "Let us in!" Approximately five seconds into the video, the crowd cheers as one of the interior East Doors opens and members of the crowd inside appear to be ejected from the building. Alarms are audible as the rioters rush out of the door. At approximately the same time, interior surveillance camera footage shows a rioter opening one of the interior East Doors and leaving the building followed by members of the crowd that police then push out.



*Figure 8: Screenshot from Interior Surveillance Camera Footage of Rioters Exiting at 3:11:25*

At 3:11:46, Hendrix created another video lasting approximately 4 minutes that shows the crowd from inside continuing to exit as alarms blare; displays broken glass in the interior doors; and records another shout of "Let us in," and a rioter crying "Now they'll have to start shootin' us." The recording continues as it captures the exiting rioters as they celebrated with chants of "USA" and as a line of police officers (and later, a member of the press) passed through the crowd and, with difficulty, entered the Capitol. Hendrix's video also recorded a shout from the crowd, taunting, "Are we holding up Congress? Are they a little upset?" and the shouted reply, "Fuck them." After the officers entered, the recording shows that Hendrix approached the doorway and entered the Capitol. As he did, different people in the crowd shouted "Push" and an officer is visible briefly who appears to be pushing against the crowd from inside the Capitol. Once he entered the Capitol, Hendrix also recorded a glimpse of his own face.



*Figure 9: A screenshot of Hendrix's Face*
*From a Recording in His Cellphone of His*
*Entry Into the Capitol*

A surveillance camera also recorded Hendrix as he entered the Capitol with his flag and poster. The footage shows Hendrix in the doorway with his cellphone raised and captures his voluntary approach to the entrance. This footage also shows Hendrix near the entrance as the crowd begins to push, creating momentum that carried Hendrix into the building. After Hendrix was clearly past the entrance, he appears to stumble briefly, but remains smiling for the duration of his time inside the Capitol. He never lost hold of his flag or his phone, and kept the poster that

he wore around his neck.  Once inside, Hendrix could not have overlooked police efforts to stop others from entering.



*Figure 10: Hendrix in the East Door Entrance Indicated by a Red Arrow*



*Figure 11: Surveillance Footage of Police Blocking Entry While Hendrix, Shown Beneath a Red Arrow, Makes a Recording Inside the Rotunda Lobby*

The intrusion of Hendrix and others at 3:15 p.m. created a potentially dangerous situation for anyone inside the East Doors.  A straight line from that doorway leads into a set of doors to the Rotunda.  By 3:10 p.m., reinforcements from the Metropolitan Police Department had joined U.S. Capitol Police inside the Rotunda in an effort to sweep an earlier crowd of intruders from the Rotunda and out of the building.  By 3:12 p.m., members of the crowd from the Rotunda began to flow out of that area towards the East Doors and continued to do so.  The crowd inside formed by this outflow was already dense as Hendrix and others entered, as shown in the foreground of Figure 10, above.  Hendrix's own recording provides an image of the crowd that continued to flow towards the East Doors from the Rotunda after he entered:



*Figure 12: Screenshot from Hendrix's Video Showing Rotunda Doorway*

Surveillance footage and Hendrix's own recording show that the area directly inside the Rotunda Doors was not capable of safely accommodating the large crowd of rioters in that area plus the substantial crowd attempting to force its way inside.

Hendrix's interior video documents certain risks from entering the Capitol.  It includes a rioter stating that someone was shot, and "that's why they want us out." Before the video ends as Hendrix was attempting to leave the building, it also reflects the difficulty members of the crowd had when attempting to exit.

Even so, Hendrix did not leave the Capitol grounds or even leave the area just outside of the East Doors.  Instead, he returned to the threshold of the East Doors and stood facing the police line as he recorded exiting rioters, the sound of alarms, the police line, and chants of "Fight for Trump" and "Hang Mike Pence."  He was close enough to capture the image below of police using shields to barricade the entrance:



*Figure 12: Screenshot from a Video Recovered from Hendrix's Phone*
*After His Exit From the Capitol*

Despite the conditions he had just witnessed, Hendrix remained in the doorway blocking the exit even as other rioters, with increasing agitation, shouted at members of the crowd like Hendrix to "back up" and to "make a hole" for them to pass through.  Hendrix remained where he

was, seeking to re-enter the Capitol. He recorded a physical confrontation with a police officer who tried to close the East Doors. Hendrix remained close enough to the police line to record the image below as officers attempted to disperse the crowd with chemical irritant spray at approximately 3:42 p.m.



*Figure 13: Screenshot from Recording Recovered from Hendrix's Phone*

Hendrix left the doorway only after his exposure to the chemical spray. He later returned to the boarding area for his bus and left Washington at about 6:30 p.m., arriving at his home in Maine on January 7, 2022.

Two weeks later, on January 21, 2021, the FBI contacted Hendrix and he agreed to meet with agents at a local parking lot. During that meeting, Hendrix admitted that he entered the Capitol, stating that the crowd "pushed themselves" inside. He explained that he left the building after one or two minutes and attempted to re-enter but left after he was hit with pepper spray. According to Hendrix, he believed that United States Capitol Police were not offering much

resistance to entry and he thought the police were "quitting" and allowing the crowd to go inside. *See* ECF 1-1 at 2.  He admitted he knew it was illegal for him to enter the Capitol and he allowed agents to obtain certain photographs and videos and videos taken on January 6 from his phone.  *Id*.

On March 25, 2021, Hendrix spoke again with FBI agents.  He provided additional details about his travel from Maine to Washington, D.C. on January 6.  He identified himself and signed and dated screenshots of his face, such as the one shown above in Figure 9.  Hendrix also produced the shirt, sunglasses, and poster that he wore on January 6 and allowed agents to photograph them. *See, e.g.*, Figure 4, above.  Except for Facebook posts showing his arrival at the Massachusetts bus station and his arrival in Washington, D.C., Hendrix denied using social media to share content about the attack on the Capitol on January 6.

## II.     <u>Procedural Background</u>

On May 25, 2021, the United States charged Hendrix by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF 1.  On May 27, 2021, law enforcement officers arrested him in Portland, Maine.  ECF 5; PreSentence Investigation Report (PSR) (February 9, 2024) ¶ 5. On June 23, 2021, the United States charged Hendrix by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF 9; PSR ¶ 1. On June 27, 2022, pursuant to a plea agreement, Hendrix pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). ECF 35, 36; PSR ¶ 4. By plea agreement, Hendrix agreed to pay $500 in restitution to the Department of the Treasury, which he ultimately paid early, before sentencing. ECF 49 at 35.

Hendrix faced a statutory maximum penalty of incarceration for six months, 40 U.S.C. § 5109(b), or of probation for five years, and a possible maximum fine of $5,000, 18 U.S.C. §

3571(b)(6).  On December 9, 2022, this Court sentenced Hendrix to 30 days' incarceration, well below the statutory maximum, three years' probation, $500 in restitution, a $10 special assessment, and no fine. ECF 46; PSR ¶ 7a; ECF 49 at 32. His conditions of probation included a restriction that Hendrix not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon.  ECF 46 at 4.  At sentencing, this Court also authorized transfer of supervision of Hendrix's probation to the District of Maine, ECF 49 at 32; 46; PSR ¶ 7d.  Hendrix completed his imprisonment term on February 24, 2023.  PSR ¶ 7b.

At sentencing, Hendrix had argued for a non-incarcerative sentence consisting only of a term of probation.  And once this Court pronounced his sentence, Hendrix objected to a split sentence based on the then-pending appeal in *Little*.  In response, this Court explained, "They're [the court of appeals] not deciding I can't sentence him to 30 days. The question is whether I can do a sentence that includes probation."  ECF 49 at 36.  When asked to substitute the term of incarceration with an additional probation condition of home confinement to avoid the issue presented in *Little*, this Court declined to do so, answering:

> No. I have -- you know, as I said, I was quite appalled when I looked at the videos. I had expected something different, particularly where we're talking about just a 90-second time in the Capitol. When I looked at what he was involved with in terms of his -- with the other -- in terms of dealing with the -- you know, the police at that point over, certainly, a more extended period, I think it's appropriate. It's different than any of the other cases that I have. And I think in terms of the context of my other cases that I have, to give him simply home confinement would not be parity and I don't think is appropriate in this case.

ECF 49 at 37.

As reflected above, Hendrix appealed his split sentence.  Following the ruling in *Little*, the D.C. Circuit ordered that he be resentenced (Case No. 22-3103).

On November 25, 2023, Hendrix was arrested in Maine as a result of a traffic stop and charged with illegal possession of a firearm and unlawful possession of a scheduled drug. At the

time of the stop, Hendrix was driving his own vehicle with two passengers, one of whom was also on probation. PSR ¶ 7g. According to the police report for the arrest, Hendrix possessed a 9 millimeter Taurus Millenium G2 pistol and additional ammunition of various calibers. *See* PSR ¶ 7g. The pistol was fully loaded with a round in the chamber.  Additional ammunition located in Hendrix's truck included four .45 caliber rounds; six .40 caliber rounds; 13 .357 caliber rounds; seven 9 millimeter rounds; three 7.62 rounds; one .270 caliber round; two 12 gauge shells; one .50 caliber round; and one pistol magazine.

When questioned by the officer conducting the stop, Hendrix denied that any weapons were in his vehicle and stated that he could not have weapons.  When Hendrix stepped out of his vehicle, the officer asked if Hendrix had any weapons on him; Hendrix said he did not and allowed the officer to pat him down.  In the floorboard area of the driver's seat, the officer discovered the Taurus 9 millimeter pistol.  When the officer asked Hendrix why he did not say there was a pistol in the car, Hendrix responded that there were BB guns in the car.  The officer replied that the pistol was not a BB gun.

The scheduled drug charge arose from prescription pills the arresting officer found in a tin on Hendrix's person containing the pills, powder and a straw.  Hendrix told the officer that he snorts his medicine, old habits die hard, and his doctor did not know he was snorting his medication.

On December 13, 2023, the Probation Office submitted a violation petition arising from the arrest.  ECF 57.  State prosecutors subsequently declined to prosecute those charges.

This Court scheduled a hearing on the probation violation for January 9, 2024.  December 21, 2023 Minute Order.  In light of the entry of judgment in Hendrix's direct appeal, however, and at the request of the parties, the Court vacated the revocation hearing and scheduled Hendrix's

resentencing.  December 21, 2023 Minute Order (vacating hearing); January 9, 2024 Minute Order (setting resentencing).

### III.    In Compliance With The Mandate, The Court Should Impose A New Lawful Sentence.

There is no dispute that Hendrix's split sentence of incarceration and probation is unlawful under the D.C. Circuit's decision in *United States v. Little*, 78 F.4th 453 (D.C. Cir. 2023). And, as in *Little*, the D.C. Circuit remanded for resentencing here. *Id.* at 461 ("So we vacate Little's sentence and remand to the district court for resentencing."); *see United States v. Hendrix*, Case No. 22-3103, (D.C. Cir. Dec. 2023) (document number 2032622) (granting joint motion to remand for resentencing, styled as a motion to govern future proceedings, and ordering "that the case be remanded for resentencing").  This Court must comply with that mandate by imposing a lawful sentence. *See United States v. Little*, No. 21-CR-315-RCL, 2024 WL 181260 at *3-7 (denying Little's motion to remove or terminate probation where the D.C. Circuit had vacated the sentence and remanded the case for resentencing, noting that "[t]he mandate rule requires the Court to obey that directive by resentencing Little").

At the same time, Hendrix should receive credit for time already served. *See Little*, 2024 WL 181260 at *6 (D.D.C. Jan. 17, 2024) ("the Court may impose an additional punishment on Little so long as it appropriately credits the time Little served in prison and on probation against the punishment"); *United States v. Martin*, 363 F.3d 25, 37-38 (1st Cir. 2004) (unlawful term of probation must be credited against any subsequent sentence of incarceration); *United States v.*

*Lominac*, 144 F.3d 308, 318 (4th Cir. 1998) (unlawful term of supervised release must be credited against any subsequent sentence of incarceration).[1]

Accordingly, the government submits that upon resentencing, the Court has three options: a term of probation or incarceration equal to the amount of time already served; a term of probation longer than the time already served, with credit for time already spent on probation and "extra" credit for time spent in custody; or a term of incarceration longer than the time already served, with credit for time already spent in custody and some kind of credit for time already spent on probation.[2]

_____

[1] Because probation is a less restrictive penalty than incarceration, crediting time served on probation against a future term of incarceration, or crediting time incarcerated against a future term of probation, should not be "a day-to-day offset." *Martin*, 363 F.3d at 39. While the precise crediting ratio in this case is for the district court to consider, the specific ratio should derive from a "fact-based inquiry" that looks to "the specific conditions of [defendant's] probation and the effect of [any crediting] on the underlying purposes of the [sentencing statute] as set out in 18 U.S.C. 3553(a)." *Id.*

[2] The resentencing in *Little* is instructive. Little was originally sentenced to a split sentence of 60 days' imprisonment and 36 months' probation. At the time of resentencing, after remand from the D.C. Circuit, Little had completed his term of imprisonment and approximately 18 months of probation. At the resentencing, the court imposed a prison sentence of 150 days. *See Little*, No. 21-CR-315-RCL, Minute Entry for Resentencing (Jan. 25, 2024); *see also Little*, 21-CR-315-RCL, ECF 73 (Notes for Resentencing). The court credited the 60 days of incarceration that Little previously served and gave an additional 30 days of credit against the new sentence for the 18 months of probation already served, noting that Little "has spent essentially no time in compliance with the terms and conditions of his probation." *Little*, 21-CR-315-RCL, ECF 73 at 2 (Notes for Resentencing). Thus, after accounting for 90 days of credit for time previously served, Little will serve an additional 60 days of prison under the lawful sentence imposed at resentencing.

*United States v. Mazzio*, No. 22-cr-214-RCL, is another case in which a January 6 defendant was sentenced to a split sentence of 60 days' incarceration and 36 months' probation for the commission of a single petty misdemeanor. At the time of resentencing, after remand from the D.C. Circuit, Mazzio had completed the term of imprisonment and approximately 14 months of probation. At the resentencing, the court imposed a probationary sentence of 46 months, crediting Mazzio, who had been fully compliant with the terms of his probation, with 14 months already spent on probation and with 20 months for the 60 days in prison. *United States v. Mazzio*, No. 22-cr-214-RCL, Minute Entry for Resentencing (Jan. 31, 2024). Thus, after accounting for 34 months

So long as credit is given for time already served, the Double Jeopardy Clause does not bar the imposition of an increased punishment at resentencing where a defendant does not have a legitimate expectation of finality in the sentence originally imposed. *See United States v. Fogel*, 829 F.2d 77, 87 (D.C. Cir. 1987) ("If a defendant has a legitimate expectation of finality, then an increase in that sentence is prohibited by the double jeopardy clause. If, however, there is some circumstance which undermines the legitimacy of that expectation, then a court may permissibly increase the sentence."); *see also United States v. DiFrancesco*, 449 U.S. 117, 137 (1980) ("the Double Jeopardy Clause does not require that a sentence be given a degree of finality that prevents its later increase"). Here, Hendrix can have no legitimate expectation of finality in his split sentence because he has challenged the legality of that sentence, and the appellate court has remanded for resentencing. *See Little*, 2024 WL 181260 at *5 ("Here, Little lacked a legitimate expectation of finality . . . because he received an illegal sentence and challenged it on direct appeal").

Courts have widely recognized that a more severe punishment can be imposed at resentencing even after service of the original unlawful sentence has begun. *See, e.g.*, *Little*, 2024 WL 181260 at 5 ("An increased punishment is permissible even if the defendant has begun serving the original, illegal sentence, although any punishment already incurred must be credited against the increased punishment."); *Hayes*, 249 F.2d at 517-18 ("a sentence which does not conform with the applicable statute [because it is below the statutory minimum] may be corrected though defendant . . . has begun to serve it"); *Lominac*, 144 F.3d at 317-18 (remanding to district court for resentencing after vacating supervised release component of split sentence, noting that term of

---

of credit, Mazzio will serve an additional 12 months of probation under the lawful sentence imposed at resentencing.

incarceration could be adjusted upwards even after defendant completed originally imposed term of incarceration), *abrogated on other grounds by Johnson v. United States*, 529 U.S. 694 (2000); *United States v. Versaglio*, 85 F.3d 943, 949 (2d Cir. 1996) (remanding to district court to consider imposition of increased fine after invalidating incarceration component of split sentence even after defendant already paid originally imposed fine in full); *United States v. Holmes*, 822 F.2d 481, 498 (5th Cir. 1987) ("Correction of a sentence can occur even if service of the sentence has begun, even if the correct sentence may be more onerous to the defendant than the original.") (citation omitted); *Christopher v. United States*, 415 A.2d 803 (D.C. 1980) (affirming sentencing court's sua sponte correction of illegal split sentence by eliminating probation component and imposing term of incarceration greater than that originally imposed where defendant had already begun serving sentence).

**IV.**     **The Court Should Resentence Defendant Based on the § 3553(a) Sentencing Factors.**

The overall purpose of the resentencing inquiry, like an original sentencing, is to ensure that the sentence is "sufficient, but not greater than necessary, to fulfill the purposes of [18 U.S.C] § 3553(a)." *United States v. Palmer*, 89-cr-36-RCL, 2023 WL 2265255, at *4 (D.D.C. Feb. 28, 2023) (cited authorities omitted). Accordingly, the government incorporates by reference its analysis of the § 3553(a) factors set forth in its original sentencing memorandum, ECF 41.

The Supreme Court in *Pepper v. United States*, 562 U.S. 476, 481 (2011), held that when a "sentence has been set aside on appeal, a district court at resentencing *may* consider evidence of the defendant's post-sentencing rehabilitation" (emphasis added). Courts have interpreted the principle articulated in *Pepper* to permit district courts to consider post-sentencing conduct evidence that "does not always benefit the defendant" and "evidence of bad acts occurring after the defendant was originally sentenced." *United States v. Lawrence*, No. 03-cr-92-CKK, 2020 WL

5253890, at *7 (D.D.C. Sept. 3, 2020), *aff'd*, 1 F.4th 40 (D.C. Cir. 2021) (quoted authorities omitted).

Accordingly, in addition to the analysis of Section 3553(a) factors incorporated herein from the United States' earlier sentencing memorandum, this Court should consider the circumstances of Hendrix's November, 2023 arrest. Those circumstances have relevance for several of the statutory factors, including Hendrix's history and characteristics, 18 U.S.C. § 3553(a)(1), and the need for his sentence to promote respect for the law, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant, 18 U.S.C. § 3553(a)(2)(A), (B) and (C).

At his original sentencing, Hendrix invoked his characteristics during his allocution when he stated, referring to his offense of conviction, "I hope you might view me as more than this error. I am better than my actions on January 6th. … I maintain my sobriety. I have learned from this and will continue to work on being a better person, Your Honor." ECF 49 at 15.

Yet Hendrix has apparently not learned from his conviction in the instant case. When stopped, he concealed the presence of a fully loaded weapon from an officer, compromising that officer's safety. He then lied to the officer, falsely stating that his fully loaded pistol was a BB gun. He additionally minimized his misuse of medication with the remark, "old habits die hard," while admitting that his doctor was unaware of his abuse of the prescription. Hendrix's dishonesty regarding the pistol and his attitude towards the misuse of his prescription are characteristics that weigh in favor of a greater sentence.

At the time of his November arrest, and by his own admission, Hendrix believed that he was on probation and subject to the conditions this Court ordered. While the United States acknowledges the ruling in *Little* and its application here, that does not detract from Hendrix's

decision to disobey an order from this Court that Hendrix believed was in full force. His willingness to disregard that order and to lie to an officer displays a continued lack of respect for the law and demonstrates a need for deterrence that is even more apparent now that at the time his sentence was originally imposed.

Hendrix is a recovering addict and as this Court noted on the record, he has PTSD. ECF 49 at 18. His access to and possession of a firearm represents a public safety concern. *See also* PSR ¶68(c) n.2 (addressing the safety concerns for supervising Probation officers).[3] The risk that Hendrix may commit additional crimes can only be greater if he compromises his judgment or aggravates existing conditions through his abuse of medication. Such concerns also weigh in favor of a greater rather than a lesser sentence.

The United States recommends that the Court sentence Hendrix to a term of probation that will, including any credit for prior probation and incarceration, comport with the Court's original intention of Hendrix serving three years of probation; the United States further recommends that this Court impose a condition of probation that prohibits Hendrix's possession of and access to firearms and other dangerous weapons, along with other appropriate conditions  Such a sentence would be "sufficient, but not greater than necessary to comply with the purposes [of the sentencing statute]," 18 U.S.C. § 3553(a), and would effectuate the intent and effect of the original sentence.

## IV.   **Conclusion**

For the reasons set forth above, the government respectfully requests that the Court resentence Hendrix in accordance with the statutory sentencing factors and impose a term of probation that will, including any credit for prior probation and incarceration, comport with the

---

[3] The PSR now addresses the condition restricting possession of and access to firearms and dangerous weapons in Paragraph 68 instead of Paragraph 67. This Court's discretion to impose the condition remains.

Court's original intention of Hendrix serving three years of probation; the United States further recommends that this Court impose a condition of probation that prohibits Hendrix's possession of and access to firearms and other dangerous weapons, along with other appropriate conditions.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    s/Karen Rochlin
        Karen Rochlin
        Assistant U.S. Attorney Detailee
        DC Bar No. 394447
        99 N.E. 4th Street
        Miami, Florida 33132
        (786) 972-9045
        Karen.Rochlin@usdoj.gov